IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS J. GRECO                              :
                            Plaintiff        :
          v.                                 :          3:CV-02-0417
                                             :          (CHIEF JUDGE VANASKIE)
UNITED STATES OF AMERICA,                    :
INTERNAL REVENUE SERVICE                     :
                            Defendants       :

## MEMORANDUM

This tax refund litigation presents substantial questions concerning the impact of the loss of the Internal Revenue Service investigative file on its ability to obtain a judgment for allegedly unpaid taxes; the classification of workers in the entertainment, bar and restaurant business as independent contractors; the availability of relief under section 530 of the Internal Revenue Code with respect to the incorrect classification of workers as independent contractors; and the liability of a corporate officer under 26 U.S.C. § 6672 for the corporation's mis-classification of workers and the failure to remit payments for withholding taxes.  Plaintiff Thomas J. Greco contends that the IRS tax assessments at issue in this case are necessarily arbitrary and must be rejected because the IRS lost its investigative file and cannot substantiate the assessments. As to the merits, Greco argues that the corporation over which he presided, Revel Railroad, properly treated bouncers, door persons and coat check persons as independent contractors rather than employees.  Alternatively, he asserts that tax liability for the alleged improper

classification of these workers is not appropriate because they have always been considered independent contractors and there was a reasonable basis for doing so.  He also maintains that Revel Railroad had no obligation to issue 1099 forms to entertainers performing at the establishments in question because the entertainers were either incorporated or did not earn more than the threshold amount that triggers the 1099 requirement.  Finally, he asserts that he cannot be held responsible for the failure of his corporate entities, Revel Railroad and Norma Jeanes, Inc., to pay withholding taxes in 1995 and 1996 because he did not willfully or recklessly disregard the obligation to remit payments.  Plaintiff has moved for summary judgment, and the government has moved for partial summary judgment.  Having concluded that the loss of the IRS investigative file does not entitle Mr. Greco to prevail in this case, and having also found that, with one exception, there are genuine disputes of material facts with respect to the substantive issues presented, I will deny the motions for summary judgment.[1]

## I. BACKGROUND

### A. Overview of Revel Railroad and Norma Jeanes

In 1988, Thomas Greco, Eric Kornfeld, and Mitchell Kornfeld took over an existing corporation named Revel Railroad, Inc.  (Def's Statement of Material Fact ("SMF") ¶ 4.)[2]  Mr.

---

[1] The one exception concerns the position of coat checker.  As to that job, the facts are not in dispute and compel the conclusion that Revel Railroad could classify the worker performing it as an independent contractor.

[2] Citation to the moving party's statement of material facts signifies that the parties do not dispute that particular fact.

Greco was the president and a fifty percent shareholder of Revel Railroad.  (Id.)  Revel Railroad

was located at the train station complex at 33 Wilkes Barre Boulevard, Wilkes-Barre,

Pennsylvania.  (Id. ¶ 6.)  The train station complex was eventually renamed Market Street

Square.  (Id. ¶ 7.)  Within the train station complex, Revel Railroad ran two restaurants and two

bars.  (Id.)  The restaurants were BeBop Café and Norma Jeanes Restaurant.  (Id.)  The bars

were Peanuts and Patio.  (Id.)  Norma Jeanes Restaurant closed in the mid-1990s.  (Id. ¶ 8.)

BeBop Café, Peanuts, and Patio remained in business until 2001.  (Id.)

　　　　In 1988, Mr. Greco and the Kornfelds also established a corporation by the name of

Norma Jeanes, Inc., located at the same address as Revel Railroad.  (Id. ¶ 9.)  Mr. Greco was a

shareholder and the president of Norma Jeanes.  (Id.)  Norma Jeanes ran a hotel and diner.

(Id. ¶ 10.)  The diner was called Palooka's, and was run by Norma Jeanes until 1995 or 1996.

(Id.)

　　　　In July of 1992, the Kornfelds resigned as officers and directors of Revel Railroad and

Norma Jeanes.  (Id. ¶ 11.)  Mr. Greco was then the only officer and director of both

corporations.  (Id.)

　　　　As an officer of both corporations, Mr. Greco had the authority to hire and fire

employees.  (Id. ¶ 12.)  Mr. Greco hired Maureen McHale to head the accounting department in

the summer of 1988.   (Id.)  Ms. McHale had an MBA in accounting from Notre Dame University

and previous experience as a senior accountant for a large accounting firm.  (Pl's SMF ¶ 20.)

3

Mr. Greco was Ms. McHale's supervisor.  (Def's SMF ¶ 14.)  Mr. Greco also hired outside

accountant Mark Belletiere.  (<u>Id</u>. ¶ 13.)  Mr. Belletiere had a degree in accounting and an MBA

in finance from Wilkes University, as well as years of experience in preparing personal and

corporate tax returns and financial statements for various entities.  (Pl's SMF ¶ 21.)

Both Norma Jeanes and Revel Railroad had financial problems since 1988.  (Def's SMF

¶ 23.)  Mr. Greco loaned about $500,000 to Revel Railroad and Norma Jeanes throughout the

years.  (Def's SMF ¶ 18, 23.)  In 1997, Norma Jeanes and Revel Railroad filed for bankruptcy

under Chapter 7.  (<u>Id</u>. ¶ 21.)  As President of both corporations, Mr. Greco executed both

bankruptcy petitions.  (<u>Id</u>.)

B. Employee vs. Independent Contractor Classifications

Prior to and during 1993, Revel Railroad classified approximately twenty-four workers as

independent contractors, as opposed to employees.  (Pl's SMF ¶ 2; Pl's Aff. ¶ 5, Ex. F, Dkt.

Entry 45.)  Those classified as independent contractors served as, <u>inter alia</u>, security

personnel/bouncers, door persons, coat check personnel, tour coordinators, and a hospitality

consultant.  (Gov't Ex. 5.)  The following people classified as independent contractors worked

as door persons at Revel Railroad: Sue Joyce Adams, Anthony Policare, Lori Williams, Kim

Randolph, Claire Rosenberg, Debbie Peters, Teresa Hanchulak, Michaelene Coffee, and

Christine Paul.  (<u>Id</u>.)  The following people classified as independent contractors worked as

security guards or bouncers: Greg Justave, Bill Williams, Sammy Martin, Charles Earlywine,

Todd Britton, James Mihal, and Michael Zeto.  The following people and jobs also received independent contractor classifications from Revel Railroad: Doug Trusavage as an electrician; Kenneth Coombs on "mircros repair;" Dawn Maffei as a coat checker; Virginia McGuire as a cleaner; Patty Kishbaugh as the ski tour coordinator; Rusty Wren as a painter; August Genetti as a hospitality consultant; and Laurie Sperry as a tour coordinator.  (Id.)

Revel Railroad first issued Forms 1099 for the workers it classified as independent contractors in 1993.  (Def's SMF ¶ 28.)   According to bookkeeper Mary Tencza, workers that earned more than $600 were issued 1099s.  (Tencza Dep. at 95, Pl's Ex. J, Dkt. Entry 45.)  Workers that earned less than $600 were not issued 1099s.  (Id.)  The first year Revel Railroad prepared Forms 1099, some of the forms were incomplete and missing the worker's social security number.  (Def's SMF ¶ 30.)  Revel Railroad paid the workers in cash.  (Id. ¶ 29.)

### 1. Employee Rules and Conflict of Interest Guidelines

Market Street Square provided Employee Rules of Conduct and Conflict of Interest Guidelines that were signed by the workers.  The Conflict of Interest Guidelines provided as follows: "It is the policy of the Market Street Square ("Company") to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics.  Accordingly, all officers, employees and independent contractors must avoid activities which are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company."  (Gov't Ex. 24 at 2.)  The guidelines then provide the

following "compromising or harmful situations" that must be avoided: (1) revealing confidential information to outsiders; (2) accepting or offering substantial gifts that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the company; (3) initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or personal or social involvement, or appearance of a personal or social involvement; (4) initiating or approving any form of personal, sexual, or social harassment of employees, customers, suppliers, or anyone else; (5) investing in or holding an ownership interest or outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company; (6) borrowing from or lending to employees, customers, or suppliers; (7) acquiring real estate of interest to the company; (8) unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees; (9) making any unlawful agreement with distributors, competitors, or customers with respect to prices, territories, or products; (10) improperly using or authorizing the use of any property of the Company or any other thing or property that is owned by person or entity; (11) engaging in any conduct which is not in the best interest of the company; and (12) making any unlawful agreement with or payment to any domestic or foreign government official or corporate representative.

The guidelines then state, "Each officer, employee and independent contractor must

take every necessary action to ensure compliance with these guidelines and to bring problem

areas to the attention of higher management for review.  Violations of this conflict of interest

policy may result in discharge without warning." (Id. at 3.)  The form then provides a line for the

"employee's signature."

Revel Railroad also had forms addressing employee rules of conduct.  The form

provided as follows:

> Market Street Square (the "Company") has established
> these General Rules of Conduct applicable to all employees.  Other
> more specific rules may be enacted by the Company from time to
> time concerning more specific issues and areas of operation.
>     Clearly defined rules of conduct are necessary for the
> orderly operation of every company.  Employees have a right to
> know what is expected of them.  Each employee must familiarize
> himself or herself with all Company rules and regulations pertaining
> to their positions and duties.
>     The Company requires that each employee faithfully abide
> by these rules and regulations.
>     The following are rules of conduct of general application and
> are supplemented by local and departmental regulations which
> must also be observed.  These rules may be modified at any time.
>     1.  Employees shall maintain a presentable appearance at
> all times while on duty and shall wear clothing appropriate to their
> duties.  Attention to good grooming and neatness is mandatory.
>         . . .
>     7. No employee shall engage in outside employment that is
> detrimental to the Company's interest or where such work is
> competitive or in conflict with the Company's interest.  Employment
> outside the Company must be reported to the employee's
> supervisor.
>     8.  Employees shall not reveal information in Company
> records to unauthorized persons.  Employees shall not publish or
> broadcast material in which the Company is identified or

7

Employee's connection with the Company is expressed or implied without first submitting such material to the appropriate Company officials for review and approval.

9.  No employee shall knowingly submit inaccurate or untruthful information for, or on, any Company record, report or document.

10. Employee must avoid tardiness, absence, and departure from work early without the permission of their supervisors. Employees must observe time limitations on rest and meal periods. Every employee shall notify his or her supervisor or specified contact of an anticipated absence or lateness in accordance with Company and departmental procedures.  Sleeping or loafing on the job is prohibited.

11.  Employees shall not use Company equipment, materials or facilities for personal purposes.

12.  No employee shall be on or about Company property soliciting funds or services, selling tickets, distributing petitions or literature for any purpose (except as otherwise provided by law) at any time without the prior consent of supervisor.

. . .

14.  Every employee will comply with safety regulations and procedures.

15.  Every employee has a duty to protect and safeguard Company property and the property of the customers and employees, and no employee shall occupy, use or operate any Company property without prior authorization.

16.  No employee shall be in unauthorized possession of any property of the Company, its customers or employees or attempt to remove such property from Company premises.

17.  Employees shall not bring their own or any other minor children to their place of work or elsewhere on Company premises during the employee's working hours when such accompaniment might interfere with the discharge of the employee's duties and responsibilities.

18.  No employee shall be in possession of firearms (licensed or unlicensed) or other weapons while on Company premises.  The rule applies to all knives not required for the performance of job duties.

8

Violation of any of these regulations may result in
disciplinary action ranging from warning to discharge.  The
measure of discipline should correspond to the gravity of the
offense as weighed by its potential effect on the Company as well
as the seniority and work record of the employee involved, among
other factors.

The Company reserves the right to make inspections of
employee lockers, desks, lunch boxes, vehicles and other items of
personal property located on Company premises in those instances
where there is reason to believe that they contain evidence of a
violation of these regulations.  Any refusal to cooperate fully in such
inspections or searches will be considered a serious form of
insubordination.

The bottom of the form then provides for an "employee signature."  (Gov't Ex. 41 at 17-19.)  Mr.

Martin, a bouncer classified by Revel Railroad as an independent contractor, signed the form.

(Id. at 19.)

Revel Railroad also had forms that set forth the following examples of conduct that

would result in immediate termination:

* Employee rudeness to customers
* Failure to show up for a scheduled shift.
* Theft of money or property from company, fellow employees, or
its guests.
* Falsifying company documents or information
* Insubordination
* Lying to a manager
* Use, possession, or being under the influence of alcohol or a
controlled substance while on company property.
* Giving away food or beverages without the prior consent of a
manager
* Serving an underage or obviously intoxicated person
* Drinking underage on company property
* Intentional destruction or MISUSE of company property

9

&ast; Absenteeism

(Gov't Ex. 32 at 3.)  The forms then contain lines for the workers to sign.  The following workers

classified as independent contractors signed the above form: Theresa Hanchulak, Sammy

Martin, August "Gus" Genetti, III, Laurie Sperry, and Bill Williams.  (Gov't Ex. 32 at 3; Ex. 41;

Ex. 42 at 13; Ex. 55 at 4; Ex. 56 at 35.)

## 2. Bouncers, Door Persons, and Coat Checkers

According to Mr. Greco, Revel Railroad did not advertise or seek applications from

bouncers for hire. (Greco Dep. at 172.)  If a person wanted to be a bouncer at Revel Railroad,

Mr. Greco would have that person contact the "lead bouncer." (Id. at 316.)   The bouncers that

worked at Revel Railroad covered shifts at various places.  (Id. at 172.)  Revel Railroad would

determine how many bouncers it needed a night and then the bouncers would schedule their

shifts "amongst themselves."  (Id. at 172-73.)  Mr. Greco further testified that the schedule made

among the bouncers "was always in flux."  (Id. at 160.)  The government, however, presented

evidence of a Revel Railroad work schedule that established the shifts for the bartenders,

bouncers, cocktail waitresses, door girls, and barbacks. (Def's Ex. 27A.)

According to Mr. Greco, workers classified as employees had their uniforms chosen by

management.  (Greco Aff. ¶ 9, Pl's Ex. F, Dkt. Entry 45.)  The bouncers at Revel Railroad

determined among themselves what they would wear to work.  (Tencza Dep. at 83, Pl's Ex. J,

Dkt. Entry 45.)  Mr. Greco wanted the uniforms to be consistent.  (Greco Dep. at 314.)  If the

uniforms were not consistent, Revel Railroad would "frown on it" but the bouncers would still work their shifts.  (Id.)

According to Mr. Greco, Revel Railroad generally did not oversee the bouncers.  (Greco Dep. at 165.)  According to Ms. Tencza, bouncers were never considered employees of Revel Railroad or Norma Jeanes and did not sign the Employee Rules of Conduct.  (Tencza Dep. at 77, 93, Pl's Ex. J, Dkt. Entry 73.)  Mr. Greco testified that the bouncers "called their own shots [and] did their own thing."  (Greco Dep. at 321.)  Revel Railroad did not permit the bouncers to admit a person under 21 into the bar or hit anyone.  (Greco Dep. at 165, 321.)  If a bouncer hit someone, Mr. Greco did not fire the bouncer because "they sort of policed themselves."  (Id. at 429.)

To receive compensation, the bouncers would inform Revel Railroad at the end of the night who worked that evening, and Revel Railroad would then pay the bouncers money in envelopes that would be distributed among themselves.  (Id. at 160.)  According to Ms. McHale, she did not believe the bouncers at Revel Railroad were ever on payroll.  (McHale Dep. at 119.)  The government presented evidence, however, that at least one bouncer, Mr. Williams, received payroll checks.  (Gov't Ex. 55 at 12.)

According to Mr. Greco, the door persons that worked at Revel Railroad were recruited in a manner similar to how the bouncers were recruited.  (Greco Dep. at 186-87.)  Revel Railroad did not accept applications for door persons.  (Id. at 186.)  Instead, a door person

11

would recruit other door persons to work certain shifts.  (Id.)  The door persons chose and paid

for their uniforms.  (Randolph Dep. at 66, Pl's Ex. G.)  The door persons were paid by shift.

(McHale Dep. at 29, Pl's Ex. H.)  According to Ms. Tencza, the door persons did not sign the

Employee Rules of Conduct.  (Tencza Dep. at 78, Pl's Ex. J.)  The government presented

evidence, however, that Theresa Hanchulak, a door person classified as an independent

contractor, signed employee rules in August 1992.  (Gov't Ex. 32 at 3.)  The government also

presented evidence that the door persons were on a work schedule.  (Def's Ex. 27A.)

The coat checker at Revel Railroad, Dawn Maffei, brought in her own hangers and

check tickets.  (Greco Dep. at 207-08, 424.)  She worked for tips and was paid on a nightly

basis after her shift.  (Id. at 207-08.)  Revel Railroad did not tell Ms. Maffei what time she had to

be at work.  (Id. at 425.)  If she wanted to make her money, the incentive was to be there when

the doors opened.  (Id. at 425-26.)  She worked during the cold times of year on Thursdays,

Fridays, and/or Saturdays.  (Id. at 426.)  During Mr. Greco's deposition, he testified that he was

not responsible for any complaints about the coats because Ms. Maffei was an "independent

person."  (Id. at 427.)  He further testified that he did not hire her, and thus, would not fire her if

coats were reported stolen by the customers.  (Id. at 428.)

According to Mr. Greco, "the success of the business did not depend to an appreciative

[sic] degree upon the performance of [the workers classified as independent contractors]."

(Greco Aff. ¶ 8.)  The government disputes this assertion, pointing out that cover charges

12

collected at the door was the second largest source of Revel Railroad's revenue. (Gov't Ex. 4 at 5; Greco Dep. at 192.)

### 3. Treatment and Characterization of the Workers

Mr. Greco asserts that the persons designated as independent contractors in 1993 were consistently treated as independent contractors. (Pl's Aff. ¶ 4.) Mr. Greco further asserts that such workers were treated as independent contractors at all times prior to, during, and subsequent to 1993. (Id. ¶ 5.)

Thomas Wayslow was a janitor for Revel Railroad who filled out a form W-4 on August 20, 1991. (Gov't Ex. 57 at 4.) Although Revel Railroad treated Mr. Wayslow as an employee, it classified cleaner Virginia McGuire as an independent contractor in 1993. (Gov't Ex. 5.)[3] By letter dated February 9, 2000, Mr. Greco warned Ms. McGuire and Mr. Wayslow to stop feeding cats on the property. The salutation of the letter stated, "Dear Employees." (Gov't Ex. 57 at 8.)

Revel Railroad kept employee files on various workers that it classified as independent contractors. For example, Mr. Martin's employee file contains an "employee warning report" dated June 18, 1993 for repeated tardiness. The report stated, "Employee was late for 2 prior shifts. Both violations were in excess of 1 hr. Verbal warnings were given both times. This is the first written statement." (Gov't Ex. 41 at 15.) The form contains a section titled, "employee's

---

[3] The record contains two different spellings of Virginia's last name: Maguire and McGuire. For purposes of this motion, the court will refer to her as Ms. McGuire.

signature." (Id.)  There is an illegible signature in the employee signature section. (Id.)

Mr. Genetti's employment file contains a warning report for "un-acceptable performance," "lack of teamwork," and "cash over/short." (Gov't's Ex. 42 at 11.)  Under the explanation section, the form states, "Gus has been showing a lack in his mgmt duties. Example: closing procedures in kitchen by sending dishwashers home." (Id.)  The form provides for an "employee's signature." (Id.)

Mr. Williams's employment file contains a written warning dated June 3, 1993  for the theft of alcohol from the company. (Gov't Ex. 55 at 7.)  He also received the written warning for being under the influence of alcohol while on company property. (Id.)  The form provided for an "employee's signature" and was signed by Bill Williams.  On July 13, 1993, Mr. Williams was written up again for drinking during his work shift. (Id. at 3.)  The issues were reviewed with Mr. Williams and accepted. (Id. at 2.)  He was also informed that he could be ineligible for unemployment due to his repeated violations of company policy. (Id.)  On July 14, 1993, Mr. Williams gave Market Street Square and Thomas Greco permission to deduct $200.00 from his next payroll check to cover an advance in pay. (Id. at 12.)

The government also presented other evidence pertaining to the classification of Revel Railroad workers.  For example, on January 24, 1994, Ms. Sperry received an "employee warning report" for giving hotel rooms to unauthorized patrons without collecting a room fee. (Gov't Ex. 56 at 12.)

### 4. Basis for the Independent Contractor Classifications

The IRS performed an audit on Mr. Greco's personal tax return in the 1980s.  (Pl's Aff. ¶ 13.)  At the time of the audit, Mr. Greco held an interest in two nightclubs, The Factory and The Woodlands.  (Id.)  The disk jockeys, bands, bouncers, door persons, and other casual laborers were treated as independent contractors at both nightclubs.  (Id.)  The IRS did not challenge this classification.  (Id.)

After the IRS examined Revel Railroad in 1993, Mr. Greco met with Chief Accountant Ms. McHale, outside accountant Mark Belletiere, and Attorney Joe Lohin to address which workers could be classified as independent contractors under the IRS guidelines.  (Belletiere Dep. at 35-36, Pl's Ex. I.)  After the meeting, Mr. Greco continued to classify the workers as independent contractors. (Id. at 35-37.)[4]

Mr. Greco testified during his deposition that he followed industry standard in treating the relevant workers as independent contractors in 1993.  (Greco Dep. at 109, 155-56.)  Mr. Greco's competitors in Luzerne and Lackawanna counties classified bouncers, admissions handlers, tour coordinators, and other casual laborers as independent contractors.  (Pl's Aff. ¶ 10.)  Mr. Belletiere testified that "based on [his] understanding from other similar businesses,

---

[4] During Mr. Belletiere's deposition, the following exchange occurred:
   Q. Did Mr. Greco follow any advice that you gave him?
   A.  As far as I know, it was consistent with the way things were being
   reported.  They filed the 1099's consistently pre and post 1993.
(Belletiere Dep. as 36-37.)

nightclub[s], and bar businesses," it was common in the industry to classify such workers as independent contractors. (Belletiere Dep. at 53, Pl's Ex. I.)  The government's expert, David Sherwyn, opined that there is no industry standard to classify bouncers, door people, tour coordinators, coat check people, and cleaning people as independent contractors. (Gov't Ex. 58 at 3.)[5]   Mr. Sherwyn further stated that, in the vast majority of cases, such workers are employees. (Id.)

### C. Mr. Greco's Responsibility and Knowledge of Unpaid Taxes

According to Mr. Greco, he delegated his authority to pay bills to Ms. McHale and the accounting office.  He further testified that he did not touch the bills.  The only time he and Ms. McHale would discuss the bills was when she had a question to ask him.  (Greco Dep. at 99, 249-50.)

According to Ms. McHale, she and Mr. Greco went over finances "all the time" after the Kornfelds left Revel Railroad in 1992.  (McHale Dep. at 84-85.)  From 1992 to 1997, Mr. Greco signed the checks to pay the creditors of Norma Jeanes and Revel Railroad.  (McHale Dep. at 65-66.)  If Mr. Greco did not sign a check, either Ms. McHale or Ms. Tencza had permission to sign Mr. Greco's name.  (Defs SMF ¶ 15.)  With the exception of small or routine bills, Mr. Greco would have to approve the bills before Ms. McHale could sign the check.  (McHale Dep.

---

[5]  Mr. Sherwyn is an assistant professor of law at Cornell University's School of Hotel Administration with experience in advising employers on whether their workers are employees or independent contractors.  (Gov't Ex. 58 at 2.)

at 78.)  When there was not enough money to pay the bills, Mr. Greco would inform Ms. McHale what bills to prioritize on occasion.  (Id. at 85.)  In 1996, Mr. Greco was also signing payroll checks of  Norma Jeanes and Revel Railroad or someone was signing the checks with his permission.  (Def's SMF ¶ 16.)

Mr. Greco signed the employment tax returns of Norma Jeanes for the quarters ending June 1995, September 1995, March 1996, and June 1996.  (Greco Dep. at 366-67, 369.)  Mr. Greco further testified that he allowed someone else to sign the employment tax return form 941 for Norma Jeanes for the quarter ending December 1995.  (Id. at 368.)  Mr. Greco signed Revel Railroad's employment tax returns for the periods ending March 1996 through June 1996. (Id. at 431.)

As to the unpaid taxes of both corporations, Ms. McHale knew immediately when the payroll taxes had not been paid.  (Def's SMF ¶ 24.)  According to Ms. McHale, she informed Mr. Greco of the unpaid taxes as soon as she was aware that the taxes were not paid.  (McHale Dep. at 59-60.)  She further stated that the IRS was monitoring Revel Railroad closely and called frequently during the time period in question.  (Id. at 88-89.)  By December of 1995, the IRS contacted Mr. Greco's representative regarding the 1993 assessment. (Gov't Ex. 12 at 4.)

As to prioritizing bills, the following exchange occurred during Ms. McHale's deposition:

Q. Ms. McHale, during the time of 1995 and 1997, did Mr. Greco ever tell you to pay a creditor or a supplier when there were unpaid payroll taxes?
A. Well, we were buying beer.  I mean, we were buying what

> we needed to keep the bar operation going.
> Q. . . . Any other vendors or suppliers?
> A. Electricity . . . what we needed to do to keep open.

(McHale Dep. at 91-92.)

Contrary to Ms. McHale's testimony, Mr. Greco testified that he did not know that the taxes were not paid until Ms. McHale showed him the tax lien notices that were issued some time in 1996.  (Greco Dep. at 120-21; Greco Aff. ¶ 7.)  He further asserts that he did not remit money to creditors and others instead of making payments to the IRS at any time after he knew taxes were owed.  (Greco Aff. ¶ 7.)

After receiving a notice from the IRS in the mail, Mr. Greco immediately sought to obtain financing to pay the delinquent taxes.  (Id. ¶ 7.)  Mr. Greco concluded extensive negotiations with a bank institution to provide financing, a portion of which was to be used to pay all payroll taxes in full.  (Id.)  The loan was conditioned upon the deferral or abatement of city, school district, and county real estate taxes.  (Id.)  Ultimately, while the city and school district authorities agreed to the deferral, the county authority retracted its agreement.  (Id.)  As a result, the financing could not be obtained.  (Id.)

### D. IRS Tax Assessments

The IRS made its first assessment against Revel Railroad on August 31,1998.  (Kosco Aff. ¶ 2.)  According to Mark Kosco's affidavit, the amount of the first assessment was $127,448.54.  (Id.)  This assessment was based upon the alleged improper classification of

18

Revel Railroad workers as of independent contractors and the failure to issue 1099s for deejays and band members in 1993, and the failure to remit payment for tax withholding on employees during the first and second quarters of 1996.  The IRS made a second assessment against Mr. Greco on September 7, 1998.  (Id. ¶ 3.)  The amount of the assessment was $26,494.33.  (Id.) The assessment represented trust fund taxes owed by Norma Jeanes for the first, second, third, and fourth quarters of 1995 and the first and second quarters of 1996 based upon employee withholdings.  (Id.)

The IRS lost its administrative file that contained the original documents supporting its tax assessments.  Despite losing the original file, the IRS asserts that the following documents produced in the lawsuit support its assessments:  Forms 1099 filed in 1993 (Gov't Ex. 7); a summary trial balance sheet for Revel Railroad and Norma Jeanes for 1993, 1995, and 1996 (Gov't Ex. 4); Revel Railroad's 941 federal income tax return for 3/96 and 6/96 (Gov't Ex. 33 & 34); and Norma Jeanes's 941 federal tax return for 6/95, 9/95, 12/95, 3/96, and 6/96 (Gov't Exs. 17-21).

As to the amount of taxes owed in 1993, the IRS submitted an appeals memo that lists the earnings of Revel Railroad's workers for 1991, 1992, and 1993.  (Gov't Ex. 12 at 5.)  The earnings appear to be derived from a tax audit of Forms 940 and 941 from 1991 through 1993. (Id. at 2.)  The earnings also appear to be derived from Forms 1099 filed in 1993.  (Gov't Ex. 7.) The total earnings for the workers referred to as casual labor – "bouncers, doorsitters, etc." – for

19

1993 is $131,516.  (Gov't Ex. 12 at 6.)  Approximately half of this amount is attributed to "unknown workers."  The memo also states that bands and entertainment earned $271,954 in 1993.  (Id.)  The memo, however, does not provide the names of any individuals associated with the bands or entertainment.  (Id.)  The memo states that Mr. Greco identified the bulk of the entertainers by their professional names only.  (Id.)

In calculating the taxes owed for the bands and entertainment, the IRS determined that Revel Railroad paid bands and disc jockeys $271,952 for the entire year.  (Kosco Aff. ¶ 5.)  It then assumed that an equal amount was expended for each quarter in 1993.  (Id. ¶ 6(d).)  The backup withholding rate in 1993 was thirty-one percent.  (Id.)  Thirty-one percent of $67,988 (25% of $271,952) is $21,076. Thus, Revel Railroad was assessed $21,076 for each quarter of 1993, or $84,304 for the entire year.  (Id. ¶¶ 4, 6.)  This tax was assessed due to Revel Railroad's failure to report the payments to the IRS and the failure to secure taxpayer identification numbers from the recipients.  (Gov't Ex. 12 at 3.)

There does not appear to be any admissible evidence to determine that $271,954 was paid to band members, disc jockeys and incorporated entertainers.  A trial balance for Revel Railroad for 1993 has a line item for "Cost of Music and Entertainment" in the amount of $285,425.80.  (Gov't Ex. 4.)  The IRS does not explain how it determined  that only $271,952 out of the $285,425.80 was subject to withholding.

Mr. Greco asserts that Revel Railroad was not required to provide 1099s to band

members because either the musical groups were incorporated entities, for which 1099s were

not required to be issued, or were unincorporated but no individual band member received at

least $600.00 in the relevant calendar year.  (Pl's Aff. ¶ 10.)  Mr. Greco asserts that no

individual entertainer was paid more than $600.00 during 1993.  (Id.) The government,

however, presented evidence that Revel Railroad hired bands and deejays at least twice a

week and sometimes three times a week, suggesting that an individual would have been paid

more than the 1099 threshold amount.  (Def's SMF ¶¶ 34-35.)

With respect to the unpaid withholding taxes, there does not appear to be a dispute as to

the amount owed by Revel Railroad and Norma Jeanes.  Moreover, there is no dispute that Mr.

Greco is a "responsible person" for purposes of potential liability for the unpaid taxes.  Instead,

the dispute is limited to whether he willfully failed to have the corporations pay the employment

taxes.

## II.  DISCUSSION

Summary judgment should be granted when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or non-

existence might affect the outcome of the suit under applicable law.  See Anderson v. Liberty

Lobby Inc., 477 U.S. 242, 248 (1986).  "Facts that could alter the outcome are material facts."

<u>Charlton v. Paramus Bd. of Educ</u>., 25 F.3d 194, 197 (3d Cir. 1994).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 ( 1986).  All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  <u>See</u> <u>Continental Ins. Co. v. Bodie</u>, 682 F.2d 436, 438 (3d Cir. 1982).  Once the moving party has satisfied its burden, the nonmoving party, "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  <u>Anderson</u>, 477 U.S. at 257.  Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials.  <u>See</u> <u>Schoch v. First Fidelity Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990).  Rule 56 requires the entry of summary judgment if there was adequate time for discovery and a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex</u>, 477 U.S. at 322.

## A. Effect of the Loss of the IRS Investigative File

Mr. Greco initially argues that "as the Defendants have lost their investigative file and have no documents to support its assessment, its assessment is clearly arbitrary and erroneous

and, therefore, summary judgment should be granted to the Plaintiff." (Br. in Supp. of S.J. Mot. at 6.) In connection with this argument, Mr. Greco points out that "[e]ven in its Appeals Case Memorandum, the government lists 'unknown workers' on two locations comprising $29,840 and $35,605 of its assessment, with no indication of whose these workers are or how much each allegedly earned (Govt. Exhibit 12)." (Id. at 5.) Mr. Greco also asserts that the backup withholding calculation for Revel Railroad in connection with payments made to entertainers lacks an evidentiary foundation.

The government responds to this argument by observing that the taxpayer bears the burden of persuasion in this litigation. In other words, Mr. Greco must, according to the government, prove that the assessments are incorrect. It also contends that, despite the loss of its investigative file, there exists adequate competent evidence to support the assessments in question.

In a refund suit, the taxpayer does shoulder the burden of proof as to the taxpayer's claim and the government's counterclaim. Psaty v. United States, 442 F.2d 1154, 1160-61 (3d Cir. 1971). Moreover, when the IRS assesses a tax, a rebuttable presumption arises that the assessment is correct. Anastasato v. IRS, 794 F.2d 884, 886 (3d Cir. 1986). "This presumption is a procedural device that places the burden of producing evidence to rebut the presumption on the taxpayer." Id. The presumption arises when the IRS submits a certification of the Commissioner's assessment, Psaty, 442 F.2d at 1159, or an affidavit signed by an IRS officer

detailing the tax liability.  United States v. Mazzara, 530 F. Supp. 1380, 1382 (D. N.J. 1982),

aff'd, 722 F.2d 733 (3d Cir. 1983).  As explained in Psaty:

> [T]he presumption is . . . based upon considerations of public
> policy.  First, as to the accuracy of the amount assessed, the
> presumption furthers the policy of requiring the taxpayer to meet
> certain bookkeeping obligations placed upon him by the Code.  It
> also recognizes that the taxpayer has more readily available to him
> the correct facts and figures.  Second, as to the legal duty to collect
> and pay over the taxes withheld and the willfulness in the failure to
> do so, the presumption appropriately requires that corporate
> officers explain their failure to perform duties imposed upon them
> by law.

Id. at 1160.

The taxpayer may rebut the presumption of correctness by showing that the assessment

is "arbitrary and erroneous."  Anastasato, 794 F.2d at 887.  If a taxpayer rebuts the presumption

with evidence sufficient to establish that the determination was erroneous, the procedural

burden of going forward with the evidence shifts to the IRS.  See id.  The ultimate burden of

proof or persuasion, however, remains with the taxpayer.  See id.; Cook v. United States, 46

Fed. Cl. 110, 118 (Fed. Cl. 2000).  "If the taxpayer offers evidence that the determination was

incorrect and the Commissioner offers no evidence to support the assessment, the taxpayer will

have met his ultimate burden 'unless such evidence is specifically rejected as improbable,

unreasonable, or questionable."  Anastasato, 794 F.2d at 887.

One way a taxpayer may prevail in a tax refund case is by showing that the assessment

is a "naked assessment without any foundation whatsoever . . . ."  United States v. Janis, 428

U.S. 433, 442 (1976).  An assessment is "naked" and "beyond saving" when "the records supporting an assessment are excluded from evidence, . . . or are nonexistent, . . . so that the basis upon which an assessment is calculated is beyond the knowledge of the court."  United States v. Schroeder, 900 F.2d 1144, 1149 (7th Cir. 1990).  Mr. Greco asserts that the loss of the investigative file presents such a scenario here.

In Coleman v. United States, 704 F.2d 326 (6th Cir. 1983), a case upon which Greco places much reliance, the plaintiffs sought a refund of approximately $20,000 on their income taxes for 1963 and 1964.  The plaintiffs filed their income tax returns late for both years and tendered final payment for the taxes in April 1967.  The IRS then directed the plaintiffs to deliver their financial records to an IRS office in Kentucky.  The IRS examined the records and noticed the plaintiffs of a deficiency in July, 1967.  The IRS letter was returned as unclaimed.  The IRS then assessed deficiencies against the plaintiffs.  After the IRS assessed deficiencies, the taxpayers sought to determine the basis for the assessment.  The IRS admitted that it could not locate the financial records nor explain the assessment.  See id. at 327.

In early 1976, the IRS initiated proceedings to foreclose its lien against the plaintiffs' home.  In response to the foreclosure proceedings, the plaintiffs secured a mortgage loan and paid the assessments.  The plaintiffs then filed a refund claim on July 1, 1976.  In 1977, the financial records retained by the plaintiffs were destroyed by a flood.

During the trial, the plaintiffs argued that an assessment is not entitled to its usual

presumption of correctness when the IRS has absolutely no financial or other factual

calculations to support the assessment.  Alternatively, the taxpayers contended that they had

carried any burden of proof by affirming the accuracy of their income tax return as originally

filed.  The government argued that, because a suit for a refund is a <u>de novo</u> proceeding, the

burden is upon the taxpayer to prove that the assessments were in error by material evidence

from which a correct determination could be calculated.  The trial court found in favor of the

government.  On appeal, the Sixth Circuit Court of Appeals considered whether the assessment

was entitled to its usual presumption of correctness.  The Sixth Circuit stated that the plaintiffs

had met their burden when "the assessment is shown to be more than merely erroneous; that

is, an assessment is per se arbitrary and unenforceable when it is established that it is 'naked'

and 'utterly without [evidentiary] foundation.'"  <u>Id</u>. at 328.  The Sixth Circuit then reversed the

district court's decision, stating:

> The "specific evidence" demonstrating a total absence of an
> evidentiary basis for the imposed assessment here in issue is the
> government's explicit admission that it possessed no evidence
> whatsoever to support its conclusions. It is difficult to conceive
> more direct evidence of a "naked assessment without <u>any</u>
> foundation whatsoever" than the government's own concessions
> that it is without "any reports, work papers and other documents" to
> support its conclusions.  Accordingly, the Colemans have here
> satisfied their burden of proving that the assessment is arbitrary
> and so cannot be enforced.

<u>Coleman</u>, 704 F.2d at 329.

The court noted, however, that the IRS has the ability to collect taxes in the absence of

original records.  The court stated, "[i]t has long been held that the Commissioner may estimate assessments by 'any reasonable method,' and such estimates will be accorded the full presumption of correctness, subject to being overturned only upon proof by the taxpayer that [the taxpayer] is entitled to a specific refund." Id. at 329.  The court further stated, "[h]ad . . . 'secondhand' records been available . . . or any demonstrably reasonable methodology of estimation, it is likely that even the destruction of [the plaintiffs'] original returns would not have precluded reliance upon the assessment's presumption of correctness." Id.  As explained by Judge Allegra in Cook v. United States, 46 Fed. Cl. 110, 114 (Fed. Cl. 2000), "an assessment is not 'naked' simply because the administrative file supporting its entry is lost – what is critical, given the de novo nature of the proceedings before this court, is that admissible evidence exists to support the assessment.  If such evidence exists, and is admitted by the court, it is irrelevant whether it is the same evidence that the Service relied upon in originally making its assessment."

Thus, the government's loss of its investigative file does not, by itself, entitle the taxpayer to prevail.  See Xenakis v. United States Dep't of Treasury, 281 B.R. 585, 599 (W.D. Pa. 2001). Instead, the pertinent inquiry in the scenario presented here is whether there remains competent evidence of the taxpayer's liability.  "'Barring special circumstances, if the defendant's liability can be calculated and enforced, it should be calculated and enforced." Id.

In the present case, the government asserts that documents produced during this

27

litigation support its assessment.  Specifically, the government relies upon Forms 1099 issued by Revel Railroad (Gov't Ex. 7), a summary trial balance sheet for Revel Railroad and Norma Jeanes for 1993, 1995, and 1996 (Gov't Ex. 4), Revel Railroad's 941 federal income tax return for 3/96 and 6/96 (Gov't Ex. 33 & 34), and Norma Jeanes's 941 federal tax return for 6/95, 9/95, 12/95, 3/96, and 6/96 (Gov't Exs. 17-21).  Because the IRS submitted evidence to support its tax assessment, the assessment cannot be deemed a naked assessment sufficient to void Mr. Greco's alleged tax liability.  See Coleman, 704 F.2d at 329; Xenakis, 281 B.R. at 599-600; Cook v. United States, 52 Fed. Cl. 62, 67 (Fed. Cl. 2002).  Accordingly, Mr. Greco is not entitled to summary judgment due to the unavailability of the investigative file.[6]

### B. Federal Employment Taxes and § 530 of the Revenue Act of 1978

Under the Internal Revenue Code, "employers must withhold federal income tax as well as social security tax from the wages they pay to employees.  In addition, employers must pay social security and unemployment taxes on behalf of their employees." Hosp. Res. Pers., Inc. v. United States, 68 F.3d 421, 424 (11th Cir.1995).[7]  "These taxes are known collectively as

---

[6] Mr. Greco, of course, retains the right to challenge the correctness of the assessments. In this regard, substantial questions have been presented with respect to the accuracy of the assessment for back up withholding on payments made to entertainers in 1993 and in the inclusion of more than $65,000 in payments made to "other workers" as independent contractors.  The record does not permit resolution of the questions at this stage of the proceedings.

[7] Congress has imposed social security taxes on the employer and employee under the Federal Insurance Contribution Act (FICA).  See 26 U.S.C. § 3101, et seq. Congress has also imposed unemployment insurance taxes on the employer under the Federal Unemployment

'employment taxes.'"  <u>Id</u>.  Employers do not withhold and pay these employment taxes for

independent contractors.  <u>See id</u>.  "In connection with payments to 'independent contractors,'

employers only have to send annual information returns, on Form 1099 to the workers and on

Forms 1096 and 1099 to the IRS, indicating the income paid [to the independent contractor]

during the year."  <u>Id</u>.  Forms 1099 and 1096 are required when the "salaries, wages,

commissions fees, and other forms of compensation for services rendered aggregate $600 or

more."  26 C.F.R. § 1.6041-1(a)(1)(i)(A).  "In light of these tax consequences, [the] proper

characterization of the employment relationship is vital."  <u>Halfhill v.  United States I.R.S.</u>, 927 F.

Supp. 171, 174-75 (W.D. Pa. 1996).

Section 530 of the Revenue Act of 1978 is a safe harbor for a taxpayer who owes FICA

and FUTA taxes as the result of mistakenly failing to classify certain individuals as employees.

<u>See</u> <u>Nu-Look Design, Inc. v. C.I.R.</u>, 356 F.3d 290, 294 (3d Cir. 2004); <u>Select Rehab, Inc. v.</u>

<u>United States</u>, 205 F. Supp. 2d 376, 379 (M.D. Pa. 2002).  Thus, if the workers are considered

employees under the common law standard, the employer will nonetheless escape employment

tax liabilities if the conditions of Section 530 are satisfied.  Section 530 provides:

> (a) Termination of Certain Employment Tax Liability
>
> (1) In general – If –,

---

Tax Act (FUTA). <u>See</u> 26 U.S.C. § 3301, <u>et seq.</u>; <u>see also</u> <u>Hosp. Res. Pers., Inc.</u>, 68 F.3d at 424
n.5

(A) for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period, and

(B) in the case of periods after December 31, 1978, all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's treatment of such individual as not being an employee, then, for purposes of applying such taxes for such period with respect to the taxpayer, the individual shall be deemed not to be an employee unless the taxpayer had no reasonable basis for not treating such individual as an employee.

(2) Statutory standards providing one method of satisfying the requirements of paragraph (1).– For purposes of paragraph (1), a taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in reasonable reliance on any of the following:

(A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer;

(B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or

(C) long-standing recognized practice of a significant segment of the industry in which such individual was engaged.

(3) Consistency required in the case of prior tax treatment.--, Paragraph (1) shall not apply with respect to the treatment of any individual for employment tax purposes for any period ending after December 31, 1978, if the taxpayer (or a predecessor) has treated any individual holding a substantially similar position as an

> employee for purposes of the employment taxes for any period
> beginning after December 31, 1977.
>
> ....
>
> c) Definitions.--For purposes of this section--,
>
> (1) Employment Tax.--The term "employment tax" means any tax
> imposed by subtitle C of the Internal Revenue Code of 1986.
>
> (2) Employment status.--The term "employment status" means the status
> of an individual, under the usual common law rules applicable in
> determining the employer-employee relationship, as an employee or as an
> independent contractor (or other individual who is not an employee).[8]

"Section 530 'shields a taxpayer who pays others for services from employment tax liability if the taxpayer has consistently treated them as other-than-employees unless the taxpayer had no reasonable basis for doing so.'" Select Re-Hab, Inc., 205 F. Supp. 2d at 380 (quoting 303 West 42nd St. Enterp. Inc. v. IRS, 181 F.3d, 272, 274 (2d Cir. 1999)).  Section 530 should be construed liberally in favor of the taxpayer.  Id.

Section 530 has three essential requirements: First, the taxpayer must have filed requisite federal tax returns (including information returns) on a basis consistent with the taxpayer's treatment of the individuals in question as independent contractors (the reporting consistency requirement); second, the taxpayer must have treated all persons holding substantially similar positions as independent contractors (the substantive consistency requirement); and third, the taxpayer must have had a reasonable basis for treating the

---

[8] Section 530 is not codified, but appears as a note to 26 U.S.C.A. § 3401 (2002).

individuals in question as independent contractors (the reasonable basis requirement).  <u>Select</u>

<u>Rehab, Inc.</u>, 205 F. Supp. 2d at 380.  The government has moved for summary judgment on the

ground that Plaintiff cannot satisfy the reporting consistency requirement.  Mr. Greco has

moved for summary judgment, asserting that, as a matter of law, he satisfies all three

requirements.

### 1. Reporting Consistency Requirement

The IRS contends that Mr. Greco failed to comply with the reporting consistency

requirement because Mr. Greco failed to file any 1099 forms for individuals treated as

independent contractors prior to 1993.  Plaintiff does not dispute that Revel Railroad did not

issue 1099 forms for those treated as independent contractors prior to 1993.  Plaintiff argues,

however, that the reporting consistency requirement pertains only to the tax year in question,

and that, for the year in question (1993), Revel Railroad issued 1099 forms to those treated as

independent contractors who received more than $600 in remuneration.  Thus, as framed by

the parties, the question here is whether § 530 requires reporting consistency for only the year

in question or whether the taxpayer must have issued the requisite forms and filed the pertinent

forms for prior periods as well.

In support of its argument, the IRS relies on <u>Murphy v. United States IRS</u>, No. 93-C-156-

5, 1993 WL 559362 (W.D. Wis. Oct. 22, 1993), and <u>In re McAtee</u>, 115 B.R. 180 (N.D. Iowa

1990).  Neither opinion is persuasive.

In <u>Murphy</u>, the taxpayer admitted that it had not filed <u>any</u> IRS Forms 1099 for the tax years in question.  Thus, the statement in <u>Murphy</u> that "[t]he requirement that all required tax returns be filed on a basis consistent with the assertion that the employee is an independent contractor . . . refers to all periods and not just those for which the IRS claims taxes are owed," 1993 WL 559362 at * 2, is dictum.

As to the other case on which the government relies, <u>In re McAtee</u>, the IRS brought a priority claim against a debtor for FICA and FUTA taxes assessed for calendar year 1985 and for the first quarter of 1986.  The bankruptcy judge found that the debtor was entitled to protection under Section 530 because (1) the debtor treated his drivers as independent contractors during 1985 and the first quarter of 1986, and (2) the debtor filed all appropriate tax returns during that period.  On appeal, the IRS argued that the debtor had to show consistent treatment and the filing of appropriate tax returns prior to 1985, since he began using drivers in 1983.  The only evidence regarding debtor's treatment of his drivers during 1983 and 1984 was the debtor's testimony that he did not remember whether he paid the drivers wages and withheld taxes and FICA.  The court held that the debtor must show that he did not treat any individual as an employee prior to 1985.  <u>See id.</u> at 183.  The court further held that the returns for all periods after December 31, 1978 must be examined for consistent treatment.  <u>See id</u>. The court then reversed and remanded the case to the bankruptcy judge for further findings of fact and conclusions of law as to the debtor's treatment of his drivers for the years prior to 1985.

See id. at 185.  In remanding the matter, the district court concluded that "[s]ection 530(a)(1), when read as a whole, requires, with respect to an individual, that (A) the taxpayer has not treated that individual as an employee for any period, and (B) . . . all federal tax returns required to be filed by the taxpayer with respect to that individual for each 'such period' are consistent in that the individual is not treated as an employee."  Id. at 183 (emphasis in original).  The district court thus equated "any period" as used in § 530(a)(1)(A) with "such period" as used in § 530(a)(1)(B).

This conclusion cannot be reconciled with the plain language of the reporting consistency requirement expressed in § 530(a)(1)(B).  The statutory language provides that "[i]f . . . in the case of periods after December 31, 1978, all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's treatment of such individual as not being an employee, then for purposes of applying such taxes for such period with respect to the taxpayer, the individual shall be deemed not to be an employee unless the taxpayer had no reasonable basis for not treating such individual as an employee."  (Emphasis added.) The statutory language thus focuses on the filing of appropriate returns "for such period" as to which taxes are sought to be applied.  Had Congress intended to require reporting consistency for more than the period for which taxes are sought to be applied, it would not have structured § 530(a)(1)(B) in the manner that it did.  Instead, it would have provided that a taxpayer would be

entitled to the safe harbor <u>only if all</u> federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual were filed on a basis consistent with the taxpayer's treatment of such individual during <u>any</u> period of time that the individual rendered services for the taxpayer.  The phrase "such taxes for such period" clearly limits the reporting consistency requirement to the years for which the IRS has assessed employment taxes on individuals treated by the taxpayer as independent contractors.[9]

Congress has directed that the <u>substantive</u> consistency inquiry extend to "any individual holding a substantially similar position [who is treated] as an employee for purposes of the employment taxes for <u>any</u> period beginning after December 31, 1977."  Section 530(a)(3) (Emphasis added).  Thus, for purposes of substantive consistency, the inquiry may extend beyond the tax period in question, but Congress made no such direction with respect to reporting consistency.  This distinction makes sense.  Reporting consistency deals with the

---

[9]Plaintiff has referred to cases that suggest that the pertinent inquiry for the reporting consistency requirement is limited to the tax year in question. For example, in <u>In re Bentley</u>, No. 93-30510, 1994 WL 171200, at *2 (E.D. Tenn. Feb. 25, 1994), the court stated that "[forms 1096 and 1099] must be filed for every year in which the taxpayer seeks the protection of the safe haven provisions of § 530(a)."  The court, however, did not articulate a rationale for this conclusion.  It should also be noted that in James John Jurinski, <u>Eligibility for Relief From Federal Employment Taxes under § 530 of Internal Revenue Code (26 U.S.C.A. § 3401 note)</u>, 149 A.L.R. FED. 627 (1998-2005), it is stated that "[a]lthough the statute does not define 'period,' the Internal Revenue Service (IRS) currently interprets a period to be the tax year in question.  The employer may fail to file a Form 1099 for year one but be eligible for 530 relief for year two if the Form 1099 is filed for year two."  The author, however, provides no citation for this statement.

communication made to the IRS as to the status of a particular worker for the period of time for

which the IRS seeks to assess taxes.  It is important that the IRS receive consistent information

when it is determining whether an individual is an employee or independent contractor during

the year or years for under examination.  The substantive consistency requirement, however, is

intended to assure that a taxpayer does not obtain the safe harbor benefit by re-classifying

employees as independent contractors even though they continue to perform essentially the

same tasks.  The information contained in tax returns for periods other than the tax year in

question may, of course, be relevant to the substantive consistency requirement.  However,

there is no logical nexus between the failure to file a 1099 in a prior year and the question of

whether the taxpayer treated an individual as an employee or independent contractor during the

year in question.  Thus, the fact that Revel Railroad did not issue 1099 forms for the 24

individuals in question during 1991 and 1992 does not preclude the taxpayer from meeting the

reporting consistency requirement.

    2.  Substantive Consistency Requirement

        The parties next dispute whether a genuine issue of material fact exists as to the

substantive consistency requirement under Section 530.  Plaintiff contends that there is no

genuine issue of material fact as to the substantive consistency requirement because it has

consistently treated the relevant workers as independent contractors.  (Pl's Br. in Supp. of Mot.

for Summ. J. at 8.)   In Mr. Greco's affidavit, he asserts that the persons designated as

independent contractors in 1993 were consistently treated as independent contractors prior to, during, and subsequent to 1993.  (Pl's Aff. ¶¶ 4-5.)

In contrast to Mr. Greco's affidavit, the record shows similar workers may have been classified differently for federal tax reporting purposes.  For example, Thomas Wayslow was a janitor for Revel Railroad that filled out a form W-4 on August 20, 1991.  (Gov't Ex. 57.)  Although Revel Railroad treated Mr. Wayslow as an employee, it classified cleaner Virginia McGuire as an independent contractor in 1993.  (Gov't Ex. 5.)  The record does not state the duties and requirements for janitors and cleaners.  Because janitors often clean, a jury could reasonably find that Mr. Greco failed to treat persons holding similar positions consistently as independent contractors.  See McLaine v. United States, Civ. A. No. 98-832, 1999 WL 164930, at *3-4 (W.D. Pa. Feb. 4, 1999) (report and recommendation that a jury determine whether the workers classified as independent contractors held "substantially similar positions" as those classified as employees).

The record also shows that Mr. Greco referred to persons classified as independent contractors as employees.  By letter dated February 9, 2000, Mr. Greco warned Ms. McGuire and Mr. Wayslow to stop feeding cats on the property.  The salutation of the letter stated "Dear Employees."  (Gov't Ex. 57 at 8.)  Because Ms. McGuire was classified as an independent contractor for federal tax purposes, referring to her as an employee in a letter is evidence of inconsistent treatment.

Revel Railroad also required workers classified as independent contractors to sign rules of conduct that applied to employees.  (Gov't Ex. 32 at 3.)  The following workers classified as independent contractors signed the form: Teresa Hanchulak, Sammy Martin, August "Gus" Genetti, III, Laurie Sperry, and Bill Williams.  (Gov't Ex. 32, 41, 42, 55, 56.)

Revel Railroad also kept "employee" files on various workers that it classified as independent contractors.  For example, Mr. Martin's employee file contains an "employee warning report" dated June 18, 1993 for repeated tardiness.  The report stated, "Employee was late for 2 prior shifts.  Both violations were in excess of one hour.  Verbal warnings were given both times.  This is the first written statement."  (Gov't Ex. 41.)  The form contains a section titled, "employee's signature."  (<u>Id</u>.)  There is an illegible signature in the section.  (<u>Id</u>.)

Mr. Genetti's employment file contains a warning report for "un-acceptable performance", "lack of teamwork," and "cash over/short."  (Gov't's Ex. 42.)  Under the explanation section, the form states, "Gus has been showing a lack in his mgmt duties.  Example: closing procedures in kitchen by sending dishwashers home."  (<u>Id</u>.)  The form provides for an "employee's signature," and contains an illegible signature.  (<u>Id</u>.)

Mr. Williams's employment file contains a written warning dated June 3, 1993  for the theft of alcohol from the company.  (Gov't Ex. 55 at 7.)  He also received the written warning for being under the influence of alcohol while on company property.  (<u>Id</u>.)  The form provided for an "employee's signature," and was signed by Bill Williams.  On July 13, 1993, Mr. Williams was

written up again for drinking during his work shift.  (Id. at 3.)  The issues were reviewed with Mr.

Williams and accepted.  (Id. at 2.)  He was also informed that he could be disqualified for

unemployment due to his repeated violations of company policy.  (Id.)  On January 24, 1994,

Laurie Sperry received an "employee warning report" for giving hotel rooms to unauthorized

patrons without collecting a room fee.  (Gov't Ex. 56.)

This evidence is sufficient to cast doubt on Mr. Greco's assertion of consistent treatment

of the workers in question.  As a result, Plaintiff's motion for summary judgment as to the

substantive consistency requirement must be denied.

### 3. Reasonable Basis Requirement

The parties next dispute whether Mr. Greco had a reasonable basis for treating the

individuals as independent contractors.  As discussed above, a taxpayer has a reasonable

basis for not treating an individual as an employee by relying on any of the following:

> (A) judicial precedent, published ruling, technical advice with
> respect to the taxpayer, or a letter ruling to the taxpayer;
>
> (B) a past IRS audit of the taxpayer in which there was no
> assessment attributable to the treatment (for employment tax
> purposes) of the individuals holding positions substantially similar
> to the position held by this individual; or
>
> (C) long standing recognized practice of a significant segment of the
> industry in which such individual was engaged.

§ 530(a)(2).

In the present case, Plaintiff first argues that he had a reasonable basis for classifying

39

the workers as independent contractors because he relied on the technical advice of Attorney

Lohin, Chief Accountant Ms. McHale, and outside accountant Mr. Belletiere to determine which

workers qualified as independent contractors under the IRS guidelines.  (Pl's Br. in Supp. of

Mot. for Summ. J. at 9.)  The record shows that Mr. Greco met with Mr. Lohin, Ms. McHale, and

Mr. Belletiere sometime in 1993 to address which workers could be classified as independent

contractors under the IRS guidelines.  The meeting occurred after an IRS agent examined

Revel Railroad.  After the meeting, Mr. Greco continued to classify the workers as independent

contractors.[10]  Based on the record, a jury could reasonably infer that Mr. Greco continued to

classify the workers as independent contractors in 1993 in reliance on the advice that he

received.  The record does not, however, compel a finding of reliance because Mr. Greco was

already classifying the workers as independent contractors prior to receiving such advice.

Absent undisputed evidence of actual reliance, summary judgment must be denied as to this

issue.  See VTA Mgmt Services, Inc. v. United States, 01CV0145ARRVVP, 2004 WL 3199677,

at *13 (E.D. N.Y. Dec. 14, 2004) (denying Plaintiff's motion for summary judgment under

Section 530(a)(2)(A) because Plaintiff failed to present undisputed evidence that it actually

---

[10] During Mr. Belletiere's deposition, the following exchange occurred:

> Q. Did Mr. Greco follow any advice that you gave him?
> A.  As far as I know, it was consistent with the way things were being
> reported.  They filed the 1099's consistently pre and post 1993.

(Belletiere Dep. as 36-37.)

relied on legal advice to treat licensed therapists as independent contractors).

Plaintiff next argues that Mr. Greco had a reasonable basis for classifying the workers as independent contractors because he followed industry standard.  (Pl's Br. in Supp. of Mot. for Summ. J. at 9.)  Mr. Greco testified during his deposition that he followed industry standard in treating the above workers as independent contractors in 1993.  Mr. Greco's competitors in Luzerne and Lackawanna counties classified bouncers, admissions handlers, tour coordinators, and other casual laborers as independent contractors.  Mr. Belletiere also testified that "based on [his] understanding from other similar businesses, nightclub, and bar businesses" that it was common in the industry to classify such workers as independent contractors.  Contrary to this assertion, the government's expert, David Sherwyn, opined that there is no industry standard to classify bouncers, door people, tour coordinators, coat check people, and cleaning people as independent contractors.  Mr. Sherwyn further stated that in the vast majority of cases, such workers are employees.  Because there is a factual dispute as to the industry standard, summary judgment will be denied.

Mr. Greco finally contends that he had a reasonable basis for classifying certain workers as independent contractors based on an IRS audit of his personal tax return in the 1980s. According to Mr. Greco, at the time of the audit, he held an interest in two nightclubs, "The Factory" and "The Woodlands."  The disk jockeys, bands, bouncers, door persons, and other casual laborers were treated as independent contractors at the two night clubs.  The IRS did not

contest this treatment of the casual workers.  While this evidence supports a finding of reasonable reliance, it does not compel such a finding as a matter of law because the workers at "The Factory" and "The Woodlands" may have worked under completely different management and work conditions that would affect the determination of whether the workers should be classified as employees or independent contractors.  As a result, summary judgment will be denied.

### C. Whether the Workers Are Employees Under the Common Law

Plaintiff asserts that, regardless of the safe harbor provision of § 530, the workers in question were properly treated as independent contractors under the applicable test for the existence of an employment relationship.  The government argues that there are genuine disputes of fact with respect to the classification of the individuals in question.

Section 3121(d)(2) of the Internal Revenue Code defines an employee for employment tax purposes as "any individual who, under the usual common law rules, applicable in determining the employer-employee relationship, has the status of an employee."  26 U.S.C. § 3121(d)(2).  Under a regulation issued by the Treasury Department, the question of whether a worker constitutes an "employee" depends on the degree of control exercised by the employer over the individual.  See 26 C.F.R. § 31.3121(d)-1©.  It is not necessary that the employer actually direct or control the manner in which the services are performed; rather, there is sufficient control if the employer has the right to do so.  See id. § 31.3121(d)-1(c)(2).  The right

to discharge is also an important factor when considering the presence of an employment

relationship.  Id.  In Revenue Ruling 87-41, 1987-1 C.B. 296, the Internal Revenue Service set

forth the following 20 factors as an aid in determining the status of an employment relationship:

> 1. INSTRUCTIONS. A worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present if the person or persons for whom the services are performed have the RIGHT to require compliance with instructions.

> 2. TRAINING. Training a worker by requiring an experienced employee to work with the worker, by corresponding with the worker, by requiring the worker to attend meetings, or by using other methods, indicates that the person or persons for whom the services are performed want the services performed in a particular method or manner.

> 3. INTEGRATION. Integration of the worker's services into the business operations generally shows that the worker is subject to direction and control. When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the workers who perform those services must necessarily be subject to a certain amount of control by the owner of the business.

> 4. SERVICES RENDERED PERSONALLY. If the Services must be rendered personally, presumably the person or persons for whom the services are performed are interested in the methods used to accomplish the work as well as in the results.

> 5. HIRING, SUPERVISING, AND PAYING ASSISTANTS. If the person or persons for whom the services are performed hire, supervise, and pay assistants, that factor generally shows control over the workers on the job. However, if one worker hires, supervises, and pays the other assistants pursuant to a contract

43

under which the worker agrees to provide materials and labor and under which the worker is responsible only for the attainment of a result, this factor indicates an independent contractor status.

6. CONTINUING RELATIONSHIP. A continuing relationship between the worker and the person or persons for whom the services are performed indicates that an employer-employee relationship exists. A continuing relationship may exist where work is performed at frequently recurring although irregular intervals.

7. SET HOURS OF WORK. The establishment of set hours of work by the person or persons for whom the services are performed is a factor indicating control.

8. FULL TIME REQUIRED. If the worker must devote substantially full time to the business of the person or persons for whom the services are performed, such person or persons have control over the amount of time the worker spends working and impliedly restrict the worker from doing other gainful work. An independent contractor on the other hand, is free to work when and for whom he or she chooses.

9. DOING WORK ON EMPLOYER'S PREMISES. If the work is performed on the premises of the person or persons for whom the services are performed, that factor suggests control over the worker, especially if the work could be done elsewhere. Work done off the premises of the person or persons receiving the services, such as at the office of the worker, indicates some freedom from control. However, this fact by itself does not mean that the worker is not an employee. The importance of this factor depends on the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises. Control over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, to canvass a territory within a certain time, or to

work at specific places as required.

10. ORDER OR SEQUENCE SET. If a worker must perform services in the order or sequence set by the person or persons for whom the services are performed, that factor shows that the worker is not free to follow the worker's own pattern of work but must follow the established routines and schedules of the person or persons for whom the services are performed. Often, because of the nature of an occupation, the person or persons for whom services are performed do not set the order of the services or set the order infrequently. It is sufficient to show control, however, if such person or persons retain the right to do so.

11. ORAL OR WRITTEN REPORTS. A requirement that the worker submit regular or written reports to the person or persons for whom the services are performed indicates a degree of control.

12. PAYMENT BY HOUR, WEEK, MONTH. Payment by the hour, week, or month generally points to an employer-employee relationship, provided that this method of payment is not just a convenient way of paying a lump sum agreed upon as the cost of a job. Payment made by the job or on straight commission generally indicates that the worker is an independent contractor.

13. PAYMENT OF BUSINESS AND/OR TRAVELING EXPENSES. If the person or persons for whom the services are performed ordinarily pay the worker's business and/or traveling expenses, the worker is ordinarily an employee. An employer, to be able to control expenses, generally retains the right to regulate and direct the worker's business activities.

14. FURNISHING OF TOOLS AND MATERIALS. The fact that the person or persons for whom the services are performed furnish significant tools, materials, and other equipment tends to show the existence of an employer-employee relationship.

15. SIGNIFICANT INVESTMENT. If the worker invests in facilities that are used by the worker in performing services and are not typically maintained by employees (such as the maintenance of an office rented at fair value from an unrelated party), that factor tends to indicate that the worker is an independent contractor. On the other hand, lack of investment in facilities indicates dependence on the person or persons for whom the services are performed for such facilities and, accordingly, the existence of an employer-employee relationship. See Rev. Rul. 71-524. Special scrutiny is required with respect to certain types of facilities, such as home offices.

16. REALIZATION OF PROFIT OR LOSS. A worker who can realize a profit or suffer a loss as a result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee. For example, if the worker is subject to a real risk of economic loss due to significant investments or a bona fide liability for expenses, such as salary payments to unrelated employees, that factor indicates that the worker is an independent contractor. The risk that a worker will not receive payment for his or her services, however, is common to both independent contractors and employees and thus does not constitute a sufficient economic risk to support treatment as an independent contractor.

17. WORKING FOR MORE THAN ONE FIRM AT A TIME. If a worker performs more than de minimis services for a multiple of unrelated persons or firms at the same time, that factor generally indicates that the worker is an independent contractor. However, a worker who performs services for more than one person may be an employee of each of the persons, especially where such persons are part of the same service arrangement.

18. MAKING SERVICE AVAILABLE TO GENERAL PUBLIC. The fact that a worker makes his or her services available to the general public on a regular and consistent basis indicates an independent contractor relationship.

46

19. RIGHT TO DISCHARGE. The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. An employer exercises control through the threat of dismissal, which causes the worker to obey the employer's instructions. An independent contractor, on the other hand, cannot be fired so long as the independent contractor produces a result that meets the contract specifications.

20. RIGHT TO TERMINATE. If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship.

Rev. Rul. 87-41, 1987-1 C.B. 296 (citations omitted).

It has been recognized that "[t]he issue of whether an employer-employee relationship exists for purposes of employment taxes has generally been held to be one of fact." In re Critical Care Support Services, Inc., 138 B.R. 378, 381 (Bnkr. E.D. N.Y. 1992).  For example, in Overeen v. United States, Civ. No. 90-1928-W, 1991 WL 338327, at * 2 (W.D. Okla. Sept. 4, 1991), the court observed that "[t]he determination of whether . . . home care workers are independent contractors or employees is a fact question."  In Hoosier Home Improvement Co. v. United States, 350 F.2d 640 (7th Cir. 1965), the court held that whether certain workers were employees for employment tax purposes was sufficiently unclear as to warrant submission of the issue to a jury.  Id. at 643.  Courts have also concluded, however, that "'[t]he ultimate question of whether an individual is an employee or an independent contractor is a legal conclusion which involves an application of the law to the facts,' and is properly resolved on

summary judgment." <u>Leb's Enter. Inc. v. United States</u>, No. 97 CV 4718, 2000 WL 139551, at *5 (N.D. Ill. Jan. 26, 2000).  Of course, where there is a dispute at to the underlying facts as to certain of the matters that govern the determination of employment status, summary adjudication is not appropriate in any event.

In the present case, Plaintiff contends that there is no genuine issue of material fact on whether the bouncers, door persons, and coat checkers were independent contractors under the common law.  (Pl's Br. in Supp. of Mot. for Summ. J. at 12.)[11]  Below, I will separately analyze each group of workers to ascertain whether their status can be resolved on the summary judgment record.

<u>Bouncers</u>

The record contains several factual disputes regarding the amount of control Revel Railroad retained over the bouncers.  The first factual dispute involves the supervision and discipline of the bouncers.  Mr. Greco testified that Revel Railroad did not generally oversee the bouncers.  Mr. Greco also testified that the bouncers "called their own shots [and] did their own thing." (Greco Dep. at 321.)  He further testified that he did not fire bouncers for hitting people because "they sort of policed themselves." (<u>Id</u>. at 429.)

In contrast to Mr. Greco's testimony, the record shows that bouncers Sammy Martin and

_____

[11] Plaintiff also contends that the band members and disc jockeys were independent contractors.  (Pl's Br. in Supp. of Mot. for Summ. J. at 12-13.)  The government stated in its counter statement of material facts that it views the entertainers as independent contractors. (Def's Counter SMF ¶ 28.)  Thus, there is no dispute as to their classification.

Bill Williams signed "Employee Rules of Conduct" that provided examples of conduct that would result in immediate termination. The record also shows that Revel Railroad did not permit the bouncers to hit anyone, use mace, or admit a person under 21 years of age into the bar. (Greco Dep. at 165.)  Revel Railroad also kept employee files on bouncers Mr. Williams and Mr. Martin that contained improper conduct warnings.

The record also contains factual disputes as to how the bouncers scheduled their work shifts, recorded their time, and received compensation by Revel Railroad.   According to Mr. Greco, Revel Railroad would determine how many bouncers it needed a night and then the bouncers would schedule their shifts "amongst themselves." (Id. at 172-73.)  Mr. Greco further testified that the schedule made among the bouncers "was always in flux." (Id. at 160.)  In contrast to Mr. Greco's testimony, the government presented evidence that the bouncers and door persons were on a work schedule.  (Def's Ex. 27A.)

As to compensation, Mr. Greco testified that the security guards would inform Revel Railroad at the end of the night who worked that evening, and Revel Railroad would then pay the security guards money in envelopes that would be distributed among themselves.  Ms. McHale further stated that she did not believe the bouncers at Revel Railroad were ever on payroll.  (McHale Dep. at 119.)  The government presented evidence, however, that Mr. Williams gave permission to Revel Railroad to deduct $200.00 from a payroll check.  Thus, there is a dispute as to whether the bouncers were paid in a manner consistent with

49

employment status.

The record also contains a factual dispute as to the importance of the bouncers and door persons to the success of Revel Railroad. According to Mr. Greco, "the success of the business did not depend to an appreciative [sic] degree upon the performance of [the workers classified as independent contractors]." (Greco Aff. ¶ 8.) Contrary to Mr. Greco's testimony, the government presented evidence that Revel Railroad earned $544,356.31 in door charges collected by the doorpersons and bouncers in 1993. (Gov't Ex. 4 at 5; Greco Dep. at 192.)

As discussed above, there are numerous factual disputes as to the amount of control Revel Railroad retained over the bouncers. There is also a factual dispute as to the bouncers importance to the business. Because the record contains factual disputes properly left for a jury, it would be inappropriate for this Court to balance the factors discussed under Revenue Ruling 87-41 at this time. As a result, Mr. Greco's motion for summary judgment as to the common law classification of the bouncers will be denied.

## Door Persons

As to the door persons, the record shows that Revel Railroad retained little control over hiring because it did not accept applications for door persons. Instead of a formal application process, a door person would recruit others to work certain shifts. As to compensation, Revel Railroad paid the door persons by shift. The door persons were responsible for the selection and purchase of their own uniforms. Thus, the manner in which the door persons were hired,

50

paid, and dressed suggests an independent contractor classification under Revenue Ruling 87-41.

As discussed above, the record contains a factual dispute regarding the importance of the doors persons to Revel Railroad's business.  The record also contains a factual dispute as to Revel Railroad's ability to discharge the door persons.  According to Ms. Tencza, the door persons did not sign the Employee Rules of Conduct that provided examples of conduct that could result in immediate termination.  (Tencza Dep. at 77-78, Pl's Ex. J.)  The government presented evidence  that Teresa Hanchulak, a door person classified as an independent contractor, signed employee rules in August, 1992.  (Gov't Ex. 32.)  Based on this evidence, a jury could reasonably infer that Revel Railroad had the ability to terminate door persons such as Ms. Hanchulak in 1993.

Thus, based on the factual disputes regarding Revel Railroad's ability to terminate the door persons and the importance of the door persons to the success of Revel Railroad, it would be inappropriate for this Court to determine their status as a matter of law.  As a result, summary judgment as to the door persons' classifications will be denied.

Coat Checker

As to the coat checker, Ms. Maffei, the record shows that she purchased her own hangers and check tickets to perform her job.  (Greco Dep. at 207-08, 424.)  She worked for tips and was paid on a nightly basis after her shift.  (Id.)  Revel Railroad did not tell Ms. Maffei

what time she had to be at work.  (Id. at 425.)  If she wanted to make her money, the incentive

was to be there when the doors opened.  (Id. at 425.)  She worked during the cold times of year

on Thursdays, Fridays, and/or Saturdays.  (Id. at 426.)  During Mr. Greco's deposition, he

testified that he was not responsible for any complaints about the coats because Ms. Maffei was

an "independent person."  (Id. at 427.)  He further testified that he did not hire her and thus,

would not fire her if coats were reported stolen by the customers.  (Id. at 428.)

        The government has not disputed the facts of Ms. Maffei's work relationship with Revel

Railroad.  Specifically, she supplied her own materials, was paid by shift, did not have set

hours, and could realize a profit based on tips.  After balancing the factors in Revenue Ruling

87-41, I find as a matter of law that Ms. Maffei was an independent contractor.  Thus, summary

judgment will be granted as to any tax liability incurred due to Ms. Maffei.

        ### D. Whether Mr. Greco May Be Held Liable under 26 U.S.C. § 6672

        As noted above, Revel Railroad and Norma Jeanes are bankrupt entities.  The

government thus seeks to hold Mr. Greco responsible for the bankrupt entities' assessed tax

liabilities.  Both parties have moved for summary adjudication of the question of whether Mr.

Greco can be held liable.

        If an employer fails to pay its employment taxes, the IRS may collect the taxes pursuant

to 26 U.S.C. § 6672.  Section 6672 provides:

                Any person required to collect, truthfully account for, and pay over
                any tax imposed by this title who willfully fails to collect such tax, or

> truthfully account for and pay over such tax, or willfully attempts in
> any manner to evade or defeat any such tax or the payment
> thereof, shall, in addition to other penalties provided by law, be
> liable to a penalty equal to the total amount of the tax evaded, or
> not collected, or not accounted for and paid over.

Thus, § 6672 imposes liability on "[a]ny person required to collect, truthfully account for, and pay over taxes who willfully fails to do so." Quattrone Accountants, Inc. v. I.R.S., 895 F.2d 921, 926 (3d Cir. 1990). "There are two conditions before liability can be imposed under section 6672: first, the individual must be a 'responsible person,' and second, his or her failure to pay the tax must be 'willful.'" Greenberg v. United States, 46 F.3d 239, 242 (3d Cir. 1994).

In the present case, the parties do not dispute that Mr. Greco was a responsible person under section 6672. The parties do dispute, however, whether Mr. Greco's failure to pay the assessed taxes was willful. (Def's Br. in Supp. of Mot. for Summ. J. at 2-3, 18; Pl's Br. in Supp. of Mot. for Summ. J. at 13.)

"A responsible person acts willfully when he pays other creditors in preference to the IRS knowing that taxes are due, or with the reckless disregard for whether taxes have been paid." Greenberg, 46 F.3d at 244. A responsible person acts with "reckless disregard" if the person "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) [the responsible person] was in a position to find out for certain very easily." United States v. Vespe, 868 F.2d 1328, 1335 (3d Cir. 1989). "Reckless disregard includes failure to investigate or correct mismanagement after being notified that withholding

taxes have not been paid." <u>Greenberg,</u> 46 F.3d at 244.

"The taxpayer need not act with an evil motive or bad purpose for his action or inaction to be willful.  Any payment to other creditors, including the payment of net wages to the corporation's employees, with knowledge that the employment taxes are due and owing to the Government, constitutes a willful failure to pay taxes." <u>Id</u>.  Furthermore, "[i]t is no defense that the corporation was in financial distress and that funds were spent to keep the corporation in business with an expectation that sufficient revenue would later become available to pay the United States." <u>Id</u>. at 244.

In the present case, a genuine issue of material fact exists as to whether Mr. Greco knowingly allowed Revel Railroad and Norma Jeanes to pay other creditors before paying the IRS taxes that were due in 1993, 1995, and 1996.  As to the unpaid taxes from 1993, the record shows that Ms. McHale and Mr. Greco went over finances "all the time" after the Kornfelds left Revel Railroad in 1992.  (McHale Dep. at 84-85.)  The IRS contacted Mr. Greco's representative about the 1993 taxes in December 1995.  (Gov't Ex. 12 at 4.)  From 1992 to 1997, Mr. Greco signed the checks to pay the creditors of Norma Jeanes and Revel Railroad.  (McHale Dep. at 66.)  If Mr. Greco did not sign a check, either Ms. McHale or Ms. Tencza had permission to sign Mr. Greco's name.  (Defs SMF ¶ 14-15.)  With the exception of small or routine bills, Mr. Greco would have to approve the bills before Ms. McHale could sign the check.  (McHale Dep. at 78.)

Based on this evidence, a jury could reasonably infer that Mr. Greco allowed the corporations to pay other creditors before paying taxes to the IRS that he knew were unpaid.  A jury could rationally infer knowledge of the unpaid taxes because Mr. Greco's representative knew of the unpaid taxes from 1993  in December 1995.  Because Mr. Greco's representative knew of the unpaid taxes from 1993, it is reasonable to infer that Mr. Greco would also know of the unpaid taxes.  Because a jury could rationally infer that Mr. Greco was aware of the unpaid taxes from 1993, he should not have allowed the corporations to pay any creditors before the tax liability was satisfied.

As to the 1995 and 1996 taxes, the record shows that the IRS was monitoring Revel Railroad closely and called frequently.  (McHale Dep. at 89).  Mr. Greco signed the employment tax returns of Norma Jeanes for the quarters ending June 1995, September 1995, March 1996, and June 1996.  (Greco Dep. at 366, 67, 69.)  Mr. Greco further testified that he allowed someone else to sign the employment tax return form 941 for Norma Jeanes for the quarter ending December 1995.  (Greco Dep. at 368.)   Mr. Greco signed Revel Railroad's employment tax returns for the periods ending 3/96 through 6/96.  (Greco Dep. at 431, Gov't Ex. 33-34.)  Ms. McHale testified that she informed Mr. Greco when the taxes had not been paid as soon as she was aware that the taxes were not paid.  (McHale Dep. at 59-60.)  She also acknowledged that the corporation was paying other creditors during the time period in question.  (McHale Dep. at 91-92.)

Based on this evidence, a jury could reasonably infer that Mr. Greco knew that the taxes were not paid in 1995 and 1996.  A jury could also reasonably infer knowledge of the unpaid taxes because the IRS frequently contacted Revel Railroad during this time period.  A jury could also reasonably find that Mr. Greco paid other creditors before paying the IRS.         The record, however, also contains countervailing evidence.  As to 1993 and the assessment for workers treated as independent contractors, Mr. Greco states that he relied upon the advice of tax professionals and industry practice.  As to 1995 and 1996, Mr. Greco states that he was unaware of any deficiency until he received a notice from the IRS in the mail. (Greco Aff. ¶ 7.) He further stated in his affidavit that he did not remit money to creditors and others instead of making payments to the IRS at any time when he knew taxes were owed.  (Id.)  A credibility issue is thus presented.  If Mr. Greco's version is accepted as true, a jury could infer that Mr. Greco did not act willfully as to the unpaid taxes from 1993, 1995, or 1996.

There is also evidence that could support a finding that Mr. Greco acted with reckless disregard as to the payment of taxes.  First, both corporations had serious financial problems since 1988.  Second, the IRS contacted Mr. Greco's representative in December 1995 about the unpaid taxes from 1993.  And finally, the IRS contacted Ms. McHale about unpaid taxes from 1995 through 1997.  A jury could also reasonably infer that Mr. Greco was in a position to find out for certain whether withholding taxes were unpaid by simply asking Ms. McHale or the accounting department about the finances.  On the other hand, Mr. Greco's statements, if

accepted as true, could persuade a fact-finder to rule in his favor.  Because willfulness is

generally a question of fact, this issue is properly reserved for a jury.  <u>See</u>, <u>e.g.</u>, <u>In re Pugh</u>, 315

B.R. 889, 898 (Bankr. D. Nev. 2004) (stating that willfulness is a question of fact); <u>Riley v.</u>

<u>United States</u>, No. 2:94-CV-124 CEJ, 2002 WL 1760856, at *3 (E.D. Mo. June 4, 2002) (same).

## III. CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment will be granted

as to the classification of the coat checker, Ms. Maffei.  The parties' motions for summary

judgment will be denied as to all other issues.


<u>s/ Thomas I. Vanaskie</u>
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS J. GRECO                         :
                        Plaintiff       :
                                        :
        v.                              :        3:CV-02-0417
                                        :        (CHIEF JUDGE VANASKIE)
UNITED STATES OF AMERICA,               :
INTERNAL REVENUE SERVICE                :
                        Defendants      :

## ORDER

NOW, THIS 4th DAY OF AUGUST, 2005, in accordance with the foregoing
Memorandum, **IT IS HEREBY ORDERED THAT**:

1. Plaintiff's motion for summary judgment (Dkt. Entry 46) as to Ms. Maffei's status as
an independent contractor is **GRANTED**.  Plaintiff's motion for summary judgment is **DENIED**
as to all other claims.

2. Defendant's motion for partial summary judgment (Dkt. Entry 50) is **DENIED**.

3. A telephonic scheduling conference will be held on **Wednesday, August 31, 2005 at
9:00 a.m.**  Counsel for the plaintiff is responsible for placing the call to 570-207-5720.  All
parties shall be ready to proceed before the undersigned is contacted.

                              s/ Thomas I. Vanaskie
                              Thomas I. Vanaskie, Chief Judge
                              Middle District of Pennsylvania